**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cornell Aydlett,<br><br>    Plaintiff,<br><br>v.<br><br>Andrew M. Saul,[1]<br>Acting Commissioner of Social Security,<br><br>    Defendant. | No. CV-19-0040-TUC-BGM<br><br>**ORDER** |

Currently pending before the Court is Plaintiff's Opening Brief (Doc. 17). Defendant filed his Answering Brief ("Response") (Doc. 18), and Plaintiff filed his Reply (Doc. 19). Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. § 405(g). The United States Magistrate Judge has received the written consent of both parties and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure.

**I.    BACKGROUND**

    ***A.    Procedural History***

On April 30, 2015, Plaintiff protectively filed a Title XVI application for Supplemental Security Income ("SSI") alleging disability as of September 1, 2014 due to

---

[1] The Court takes judicial notice that Nancy A. Berryhill is no longer Acting Commissioner of the Social Security Administration ("SSA"). The Court will substitute the new Commissioner of the SSA, Thomas M. Saul, as Respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. *See also* Fed. R. App. P. 43(c)(2).

knee problems, shoulder pain, back pain, bone and bone pain, cervical condition, numbness pain and heat in extremities, headaches, and backpain. *See* Administrative Record ("AR") at 17, 20, 38, 42–43, 88–90, 102–04, 178, 185, 197, 200, 207. The Social Security Administration ("SSA") denied this application on July 7, 2015. *Id.* at 17, 88–101, 122–25. On August 14, 2015, Plaintiff filed a request for reconsideration, and on November 3, 2015, SSA denied Plaintiff's application upon reconsideration. *Id.* at 17, 102–17, 122, 129. On November 19, 2015, Plaintiff filed his request for hearing. *Id.* at 17. On November 1, 2017, a hearing was held before Administrative Law Judge ("ALJ") Mary Ann Lunderman. *Id.* at 17, 35–57. On January 4, 2018, the ALJ issued an unfavorable decision. AR at 14–30. On March 2, 2018, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on June 7, 2018, review was denied. *Id.* at 1–8, 139–43. On July 1, 2019, Plaintiff filed this cause of action. Compl. (Doc. 1).

### ***B.*** *Factual History*

Plaintiff was forty-eight (48) years old at the time of the administrative hearing and forty-five (45) at the time of the alleged onset of his disability. AR at 17, 28, 39, 88–89, 102–03, 178, 185, 197. Plaintiff obtained a high school diploma and attended technical school without a degree. *Id.* at 28, 40, 102, 208. Prior to his alleged disability, Plaintiff worked as a cook, delivery driver, and stocker. *Id.* at 28, 40–42, 167, 169–77, 208, 213.

#### 1. **Plaintiff's Testimony**

##### a. **Administrative Hearing**

At the administrative hearing, Plaintiff testified that he is married with one daughter. AR at 39. Plaintiff further testified that he has a driver's license and is able to drive. *Id.* at 39–40. Plaintiff indicated that he had received some technical training in electronics but did not receive a degree. *Id.* at 40. Plaintiff testified that he had unsuccessfully sought work including cooking jobs, deliver jobs, stocking jobs, and phone work. *Id.* Plaintiff described his last job at the 99 Cents Store as a stocking position, which lasted five (5) months, but ended because he could not physically perform the work. *Id.* at 40–41. Plaintiff further described working as a pizza delivery driver for two (2) years, and

explained that he left the position because it was physically difficult for him to climb up and down stairs. AR at 41. Plaintiff testified that in the last fifteen (15) years, his work included cooking in a restaurant, a cashier, a stocker, a delivery assembly person, and in moving. *Id.* at 42.

Plaintiff testified that he is unable to work because he can barely put any pressure with his thumb, his knee swells, his back pain prevents him from bending, he has difficulty walking, he has trouble sleeping, his shoulder has a constant burn, and his neck causes constant pain and does not have a full range of motion. *Id.* at 42–43. Plaintiff further testified that he does not take any medications because of the side effects. *Id.* at 43; *see also* AR at 215. Plaintiff also expressed a fear of addiction with prescription medications. AR at 43. Plaintiff denied drinking alcohol but admitted to smoking marijuana approximately twice per month. *Id.* at 43–44. Plaintiff reported that he did not have a medical marijuana card because he could not afford one. *Id.* at 44. Plaintiff estimated that he can lift between twenty (20) and twenty-five (25) pounds and stand or walk for approximately ten (10) minutes at a time. *Id.* Plaintiff described his time during the day as watching television, getting up and trying to do a little something to keep his mind off not being able to do anything. *Id.* at 44–45. Plaintiff testified that his wife and sister-in-law do the cleaning and laundry, while he does a little bit of yard work approximately once per month. AR at 45. Plaintiff reported that he "can barely get out of bed when it's cold." *Id.*

Plaintiff testified that when he was still working, he could only work part-time because he could not stand, bend, or sit as long as a full-time position would require. *Id.* at 45–46. Plaintiff further testified that he could not always meet the quotas his job required, but his managers would sometimes overlook this deficiency when they saw Plaintiff trying his hardest. *Id.* at 46. Plaintiff also testified that he loses feeling in his hand which causes him to drop things or be unable to grip things. *Id.* at 46–47. Plaintiff described feeling depressed because he is unable to provide for his family. AR at 47. Plaintiff confirmed that he does not see a doctor very often and explained that he does not

have health insurance because he cannot afford it. *Id.* at 48. Plaintiff testified that the neurosurgeon required the down payment for surgery of $4,000.00 to even schedule an appointment. *Id.* at 48–49. Plaintiff further testified that did not have that amount of money. *Id.* at 49.

### b. Administrative Forms

#### i. *Exertional Daily Activities Questionnaire*

On October 14, 2015, Plaintiff completed an Exertional Daily Activities Questionnaire in this matter. AR 183–84, 194–96. Plaintiff reported that he lived in an apartment with his family. *Id.* at 183, 194. Plaintiff described his average day as follows:

> Make breakfast, take daughter to school, come back home & take out garbage, rest for a few hours, run errands. Pick up daughter from band practice, go to work, deliver pizza & wash dishes, sweep, go home, take time to relax and wind down, ice or heat pack for 30–45 min. go to bed.

*Id.* at 194. Plaintiff described his symptoms as including dizziness or lightheadedness; extreme back pain; heat radiating down his right side including his lower lumbar, right leg, and complete arm; pain and no strength in his hands, including carpal tunnel in his right arm; and an inability to get comfortable due to pain when sleeping. *Id.* at 183,194. Plaintiff reported he walks from his house to the car and estimated that it took between two (2) and ten (10) minutes to walk approximately 200 feet. *Id.* Plaintiff also reported that he carries a garbage bag daily and dishes, pans, and pizza dough approximately four (4) times per week. AR at 195.

Plaintiff reported that while his wife does the cleaning, he cooks, takes out the garbage, and does the dishes. *Id.* Plaintiff further reported that lifting certain things makes his arm give out. *Id.* Plaintiff confirmed that he can drive a car. *Id.* Plaintiff described visiting his sons approximately four (4) times per week as his activity outside of the home. *Id.* Plaintiff indicated that he was able to do physical activities and chores more easily prior to the onset of his disability. AR at 195. Plaintiff reported that he sleeps approximately three (3) hours per night and naps for approximately fifteen (15) to twenty (20) minutes, three (3) times per week. *Id.* Plaintiff denied taking any medications and

reported using a back and knee brace daily, as well as reading glasses, and sometimes a cane depending on pain. *Id.* at 184, 196. Plaintiff noted that his right leg gives out on a daily basis when he steps down with heat and pain down his leg. *Id.* at 196.

### ii. Headache Questionnaire

On June 10, 2015, Plaintiff completed a Headache Questionnaire. AR at 181–82. Plaintiff reported that he began having headaches approximately three (3) months prior and described having them four (4) times per week. *Id.* at 181. Plaintiff noted that his headaches had not yet been diagnosed by a doctor. *Id.* Plaintiff indicated that his headaches generally lasted between two (2) and four (4) days and described that they started at the back of his head and extended to his temples and caused constant pain with nausea. *Id.* Plaintiff stated that there were no factors which caused his headaches. *Id.* at 182. Plaintiff further noted that he is unable to function due to the headache pain. AR at 182. Plaintiff reported taking Naproxen, as needed, for his headache, which gives some relief. *Id.* Plaintiff also indicated that laying down in a quiet, dark room provided relief. *Id.*

## 2. <u>Vocational Expert Ashley Haroldson Johnson's Testimony</u>

Ms. Ashley Haroldson Johnson testified as a vocational expert at the administrative hearing. AR at 17, 50–56. The ALJ asked Ms. Johnson to classify Plaintiff's past work. *Id.* at 51. Ms. Johnson described Plaintiff's past relevant work as a store laborer, Dictionary of Occupational Titles ("DOT") number 922.687-058, unskilled, and medium in physical demand. *Id.* at 52. Ms. Johnson described Plaintiff's work as a delivery driver, DOT number 292.353-010, with a Specific Vocational Preparation ("SVP") of 3—semi-skilled, and a light exertional level. *Id.* Ms. Johnson also described Plaintiff's position as a cashier II, DOT number 211.462-010, with an SVP of 2—unskilled, and a light exertional level. *Id.* Finally, Ms. Johnson described Plaintiff's past work as a cook, DOT number 313.361-014, with an SVP of 7—skilled, and a medium exertional level. AR at 52.

The ALJ asked Ms. Johnson to consider a hypothetical individual of Plaintiff's age, education, and work experience and who is limited to light exertional work, but with

standing and walking limited to two (2) hours; able to occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds; able to occasionally balance, stoop, bend at the waist, but never kneel, crouch, bend at the knees, or crawl; cannot reach overhead bilaterally; limited to frequent handling and gross manipulation; and who's assigned work area must have less than occasional, seldom or rare exposure to concentrated extreme cold, vibration, and hazards such as unprotected heights. *Id.* at 53. Ms. Johnson testified that such an individual would not be able to perform Plaintiff's past work. *Id.* Ms. Johnson further opined that there would not be any jobs at the light level based on the limited standing and walking. *Id.*

Accordingly, the ALJ asked Ms. Johnson to consider the same hypothetical individual but reduced the exertional level from light to sedentary. *Id.* Ms. Johnson opined that such an individual would not be able to perform Plaintiff's past work. AR at 53. Ms. Johnson further opined that there would be other work available to such an individual. *Id.* Ms. Johnson testified that such an individual would be able to perform other work, including a document preparer, DOT number 249.587-018, with an SVP of 2—unskilled, and sedentary exertional level, and 104,000 jobs in the national economy. *Id.* Ms. Johnson also suggested that the hypothetical individual could work as an order clerk, DOT number 209.567-014, with an SVP of 2, and sedentary exertional level, and approximately 20,000 jobs in the United States. *Id.* at 53–54. Ms. Johnson's third work suggestion was a charge-account clerk, DOT number 205.367-014, with an SVP of 2, and sedentary exertional level, with approximately 17,000 jobs in the national economy. *Id.* at 54.

Ms. Johnson confirmed that the identified jobs were consistent with the DOT and Selected Characteristics of Occupations ("SCO") occupational descriptions and characteristics, except for with regard to the overhead reaching. AR at 54. Ms. Johnson testified that the overhead reaching limitation is not specifically addressed by the DOT, and her testimony in that regard is based on her experience and training. *Id.* Ms. Johnson confirmed that she had considered all of the limitations contained in the hypothetical when identifying available jobs. *Id.* Ms. Johnson also noted that there would not be any further

erosion of the number of available jobs due to any specific limitation. *Id.*

Plaintiff's counsel asked about possible jobs available to the same hypothetical individual but with handling, fingering, and feeling to occasional. *Id.* at 54–55. Ms. Johnson testified that the identified jobs would be eliminated and opined that there would not be other jobs available. AR at 55. Ms. Johnson further testified that there would not be any jobs available at the semi-skilled level either. *Id.* Ms. Johnson noted that if the handling, fingering, and feeling limitation were reduced to frequently the identified positions would still be available. *Id.* at 56. Plaintiff's counsel also asked about the availability of jobs if the hypothetical individual required alternating sitting and standing every half-hour. *Id.* at 55. Ms. Johnson testified that the identified jobs would remain. *Id.*

### 3. Plaintiff's Medical Records

#### a. Treatment records

On March 28, 2014, Plaintiff was seen by Steven B. Wallach, D.O. regarding lower back pain and right ankle pain. AR at 234. Plaintiff reported having undergone Magnetic Resonance Imaging ("MRI") in 2010 and was diagnosed with herniation of the nucleus pulposus ("HNP") in his lumbar spine. *Id.* Plaintiff described the pain as intermittent, with numbness in his legs, and pain down his right leg. *Id.* Plaintiff further reported bilateral shoulder pain. *Id.* Dr. Wallach observed restricted range of motion in Plaintiff's lumbar spine and pain with complete abduction in his shoulders. *Id.* Dr. Wallach's assessment included low back pain with a history of HNP and chronic shoulder dislocation. AR at 234. Dr. Wallach's plan included lumbar physical therapy and a meloxicam prescription. *Id.*

On August 12, 2014, Plaintiff returned to Dr. Wallach regarding right arm numbness, the inability to lift his left arm over his head, and heat in his right leg. *Id.* at 233. Plaintiff reported having had physical therapy for his low back, that his right hand goes numb and caused him to drop things, and his right leg gives way. *Id.* Dr. Wallach reported that Plaintiff's right hand had negative Tinel's and Phalen's signs with good sensation and no atrophy. *Id.* Dr. Wallach assessed lower back pain with radicular right

leg pain and intermittent right hand numbness ruling out carpel tunnel syndrome. AR at 233. Dr. Wallach prescribed a lumbar spine MRI. *Id.* On August 29, 2014, Plaintiff was seen at the Center for Neurosciences for a nerve conduction study. *See id.* at 244–48, 257. W. Horace Noland, M.D. reported that nerve conduction studies were performed on Plaintiff's right upper extremity. *Id.* at 244, 257. Dr. Noland noted that Plaintiff's "median sensory response showed mildly prolonged peak latency[,] . . . [and] [n]eedle exam of the right upper extremity showed rare fibrillation potential abnormalities in the triceps muscle." *Id.* Dr. Noland interpreted the study to be compatible with mild right carpal tunnel syndrome and noted that the electromyography ("EMG") results suggested some right C7 radiculopathy. AR at 244, 257.

On September 23, 2014, Plaintiff was seen by Dr. Wallach for increased lower back pain on the right without radiation and his right hand going numb. *Id.* at 232. Dr. Wallach assessed low back pain with radicular symptoms on the right, and right hand numbness with the need to rule out HNP in the cervical spine. *Id.* Dr. Wallach ordered an MRI and prescribed tramadol. *Id.* On September 27, 2014, Plaintiff was seen at Northwest Medical Center and underwent MRI of the lumbar spine and the cervical spine, both without contrast. AR at 227–29, 240–43, 252–56. Guy Thompson Borders, M.D. reviewed the images. *See id.* Regarding Plaintiff's lumbar spine, at the L5-S1 level, Dr. Borders found:

> There is disc desiccation with loss of disc space height and a broad-based posterior disc herniation identified flattening the anterior thecal sac and mildly narrowing the right and left lateral recess. Lateral extension of disc herniation is identified in both the right and left neural foramen with foraminal narrowing. Adjacent endplate degenerative edematous changes are present in the anterior inferior 05 and superior anterior S1 vertebral body.

*Id.* at 227, 240, 253–54, 255–56. Dr. Borders's impression noted that these changes were causing foraminal stenosis. *Id.* at 228, 241, 254, 256. Regarding Plaintiff's cervical spine, at the C3-C4 level, Dr. Borders's impression noted:

> Findings most consistent with cord myelomalacia. Spinal canal stenosis is present from a posterior disc osteophyte complex. Cord edema cannot be definitively excluded and if prior studies are available, these would be useful

>from outside institutions. This abnormal focus of myelomalacia may represent sequela of prior trauma.

*Id.* at 229, 242, 243, 252.

On October 7, 2014, Plaintiff returned to Dr. Wallach complaining of considerable low back pain into the right leg and seeking a work excuse. AR at 231. Dr. Wallach noted the broad based disk herniation at L5-S1 reported on the MRI. *Id.* Dr. Wallach assessed HNP of the lumbar spine at L5-S1 and chronic neck pain. *Id.* Dr. Wallach referred Plaintiff to a neurosurgeon and prescribed Vicodin. *Id.* Dr. Wallach also recommended no physical activity at work until Plaintiff's work up and treatment were completed. *Id.* On October 20, 2014, Plaintiff saw Dr. Noland for a follow-up regarding his MRI. AR at 237–43, 251–56. Dr. Noland noted that he had not received the MRI results. *Id.* at 237, 251. Dr. Noland's review of Plaintiff's systems was unremarkable, as was his general examination. *Id.* Dr. Noland reported that Plaintiff's "[s]trength was normal in the upper and lower extremities[,] but [he] thought [Plaintiff's] effort on right triceps testing was poor[] [and] [g]rip effort bilaterally was not good." *Id.* at 238. Dr. Noland assessed lower back pain and spinal stenosis in Plaintiff's cervical region but noted that Plaintiff did not exhibit clinical findings of C7 radiculopathy. *Id.* at 239. On October 24, 2014, Plaintiff was seen by Dr. Wallach regarding his DES paperwork. AR at 230. Plaintiff reported that his right leg pain was resolved; however, he had left hip pain. *Id.* Plaintiff further reported that the pain was not "terrible" but remained present. *Id.* Dr. Wallach observed that Plaintiff walked with a limp and exhibited pain with palpation over the left hip greater trochanter and with abduction. *Id.* Plaintiff declined treatment for his left hip. *Id.* Dr. Wallach also expressed confusion regarding Plaintiff's feelings that he could not work. *Id.*

On November 13, 2014, Plaintiff saw Brian P. Callahan, M.D. at the Center for Neurosciences. AR at 235–36, 249–50, 274–75. Dr. Callahan's impression was that Plaintiff "ha[d] severe spinal stenosis and cervical myelopathy . . . [and] cord signal change." *Id.* at 235, 249, 274. Dr. Callahan further noted that Plaintiff exhibited a Hoffman sign on examination. *Id.* Dr. Callahan highly recommended surgery and described the

surgery and its risks to Plaintiff. *Id.* Plaintiff indicated that "he [wa]s having financial problems . . . [and] need[ed] to look into things before he can have surgery." *Id.*

On June 18, 2015, Plaintiff had imaging studies of his knees to assess his bilateral knee pain. AR at 259. Troy McDaniel, M.D. found "[m]ild narrowing of the medial compartment of the right knee without osteophytes or other abnormality." *Id.* Dr. McDaniel further found that Plaintiff's "[l]eft knee demonstrate[d] postoperative changes of anterior cruciate ligament reconstruction with screws in the distal femur and proximal tibia[;] [m]oderately severe narrowing of the medial and lateral compartments with medial offset of the distal femur relative to the proximal tibia[;] [and] [a]bnormal lucencies [we]re seen in the proximal tibia which may represent postoperative change only." *Id.*

On April 5, 2016, Plaintiff was seen by Dr. Wallach seeking a physical therapy referral. AR at 276–77. Dr. Wallach noted that Plaintiff reported he was doing well with no current complaints. *Id.* at 277. Dr. Wallach's examination was unremarkable. *Id.*

### b. Examining physicians

#### i. Jeri Hassman, M.D.

On January 18, 2015, Jeri Hassman, M.D. examined Plaintiff at the request of Arizona Department of Economic Security. AR at 260–67. Dr. Hassman noted that Plaintiff alleged knee problems, shoulder pain, back pain and bone pain, a cervical condition, numbness, pain and heat in his extremities, and headaches. *Id.* at 260. Plaintiff reported frequent neck pain, mid and low back pain, occasional headaches, occasional loss of balance, occasional dizziness, and occasional burning down the right upper or lower extremity. *Id.* at 261. Dr. Hassman noted that Petitioner "was independent getting in an out of the chair, but he was a little guarded getting out of the chair . . . and slightly favored his left knee[.]" *Id.* Dr. Hassman further noted that Petitioner "had a minimal limp, slightly favoring his left knee with ambulation, but he was able to tolerate full weightbearing on both the left leg and the right leg[] . . . [and] did not have any assistive device." *Id.*

Dr. Hassman reported that Plaintiff exhibited "pain and catching and palpable clunking with range of motion of both shoulders, left worse than right." AR at 261. Dr.

Hassman observed that "[i]t felt as if there were minor subluxations of the left shoulder during left shoulder range of motion." *Id.* at 261–62. Dr. Hassman further observed moderate pain with range of motion and a positive apprehension sign with Plaintiff's left shoulder, and minimal pain with range of motion and a negative apprehension sign with Plaintiff's right shoulder. *Id.* at 262. Dr. Hassman also noted minimal pain in the left shoulder upon impingement testing, but no pain for the right shoulder. *Id.* Plaintiff exhibited 4+/5 strength for left shoulder abduction and normal strength for his right shoulder. *Id.*

Dr. Hassman reported a full range of motion of both elbows, wrists, and fingers, as well as normal manual dexterity and normal fine motor coordination of the fingers. AR at 262. Dr. Hassman indicated Plaintiff's right grip strength was 36 kg and left grip strength was 19–20 kg. *Id.* Dr. Hassman noted negative Phalen's test and Tinel's sign bilaterally. *Id.* Dr. Hassman further noted that motor examination of both upper extremities was normal except for minimal left shoulder weakness associated with pain. *Id.*

Examination of Plaintiff's thoracic and lumbar spine was unremarkable except for mild-to-moderate tenderness over the lumbar spine and paraspinal muscles. *Id.* Plaintiff also exhibited a full range of motion of both hips, knees, and ankles without pain except for minimal-to-moderate pain with range of motion and 4+ grinding in both knees. AR at 262. Dr. Hassman indicated that Plaintiff's lower legs had no atrophy, tenderness, or edema and neurological examination revealed normal motor strength and sensation and 1+ knee and ankle reflexes bilaterally. *Id.*

Dr. Hassman's diagnoses again noted 4+ grinding/crepitus and pain with range of motion in both knees, but no swelling, warmth, or tenderness in either knee. *Id.* Dr. Hassman also noted Plaintiff had a slightly antalgic gain, with a slight limp on the left knee. *Id.* Dr. Hassman noted mild pain with lumbar range of motion, as well as low back pain with heel walking, hopping, and bending. *Id.* Finally, Dr. Hassman noted Plaintiff's palpable clunking and abnormal range of motion of both shoulders, with the left shoulder worse than right, and a positive apprehension test of the left shoulder. *Id.* at 263.

Dr. Hassman also completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical). AR at 263–67. Dr. Hassman opined that Plaintiff's condition would impose any limitations for twelve (12) continuous months. *Id.* at 263. Dr. Hassman also confirmed that Plaintiff had restrictions in lifting and carrying. *Id.* Dr. Hassman opined that Plaintiff could lift or carry twenty (20) pounds occasionally and ten (10) pounds frequently. *Id.* at 264. Dr. Hassman further opined that Plaintiff's ability to stand and/or walk was limited to at least two (2) hours but less than six (6) hours in an eight (8) hour day. *Id.* Dr. Hassman noted that Plaintiff did not use an assistive device and had no limitations in sitting. AR at 264. Dr. Hassman found Plaintiff unlimited in his ability to see, hear, or speak. *Id.* Dr. Hassman opined that Plaintiff could frequently stoop, handle, and finger; occasionally climb ramp, stairs, ladder, rope, and scaffolds, kneel, crouch, crawl, and reach; and feel without limitation. *Id.* at 265. Dr. Hassman also found Plaintiff to be unrestricted in his ability to work around heights; moving machinery; extremes in temperature; chemicals; dust, fumes, or gases; and excessive noise. *Id.*

### ii. Noel L. Shaw, D.C.

On October 4, 2017, Plaintiff was seen by Noel L. Shaw, D.C. for examination. AR at 270–71. Dr. Shaw noted that Plaintiff's active range of motion in his lumbar spine was limited and extension and rotation of both the lumbar spine, as well as external rotation and extension of the hip elicited hip and low back pain. *Id.* at 270. Dr. Shaw also reported Plaintiff's active range of motion in his cervical spine were limited. *Id.* Dr. Shaw noted that Plaintiff had markedly reduced finger/grip strength. *Id.* at 271.

Dr. Shaw completed a Physical Residual Functional Capacity Assessment ("RFC") regarding Plaintiff. *Id.* at 269. Dr. Shaw opined that Plaintiff could stand more than two (2) hours during an eight (8) hour day. AR at 269. Dr. Shaw further opined that Plaintiff could sit for thirty (30) to sixty (60) minutes before needing to change position and could walk more than one (1) block before needing to stop. *Id.* Dr. Shaw noted that Plaintiff had the ability to occasionally lift and carry twenty (20) pounds; reach; stoop; and crouch; but could never lift and carry more than twenty (20) pounds; feel, finger, or handle; grasp; or

kneel. *Id.* Dr. Shaw indicated that Plaintiff did not need to lie down during the day but needed to alternate sitting and standing every hour. *Id.* Dr. Shaw opined that Plaintiff would be unable to work due to his physical conditions more than five (5) days per month. *Id.*

### c. Reviewing physicians

#### i. Charles Combs, M.D.

On July 7, 2015, Charles Combs, M.D. reviewed Plaintiff's medical records for the initial determination and provided a physical residual functional capacity assessment. AR at 96–99. Dr. Combs opined that Plaintiff had exertional limitations. *Id.* at 96. Dr. Combs further opined that Plaintiff could frequently lift and carry up to ten (10) pounds, could stand and/or walk for a total of two (2) hours, and sit for approximately six (6) hours in an eight (8) hour workday with periodic alternating between sitting and standing to relieve pain and discomfort. *Id.* at 96–97. Dr. Combs found Plaintiff unlimited in his ability to push and/or pull other than the limitations for lifting and carrying. *Id.* at 97. Dr. Combs delineated Plaintiff's postural limitations to include occasionally climbing ramps and stairs; balancing; and stooping; but never climbing ladders, ropes, or scaffolds; kneeling; crouching; or crawling. *Id.* Dr. Combs noted that Plaintiff was limited in his ability to reach overhead bilaterally, as well as handling, but was unlimited in his ability to finger or feel. AR at 97–98. Dr. Combs indicated that Plaintiff did not have any visual or communicative limitations. *Id.* at 98. Dr. Combs also indicated that Plaintiff was unlimited regarding exposure to extreme heat; wetness; humidity; noise; fumes, odors, dusts, gases, and poor ventilation. *Id.* Dr. Combs found that Plaintiff should avoid concentrated exposure to extreme cold, vibration, or hazards. *Id.*

#### ii. Charles Fina, M.D.

On October 26, 2015, Charles Fina, M.D. reviewed Plaintiff's medical records for a determination on reconsideration and provided a physical residual functional capacity assessment. AR at 112–15. Dr. Fina opined that Plaintiff was limited to frequently lifting or carrying ten (10) pounds, standing and/or walking for two (2) hours, and sitting for

approximately six (6) hours in an eight (8) hour workday. *Id.* at 113. Dr. Fina further opined that Plaintiff was unlimited in his ability to push and/or pull other than the lift/carry restriction. *Id.* Dr. Fina reported that Plaintiff could occasionally climb ramps and stairs; balance; and stoop; but could never climb ladders, ropes, and scaffolds; kneel; crouch; and crawl. *Id.* Dr. Fina opined that Plaintiff's ability to reach overhead was limited bilaterally, as was his ability to handle. *Id.* at 114. Dr. Fina noted that Plaintiff was unlimited in his ability to finger and feel. *Id.* Dr. Fina found no limitation regarding Plaintiff's vision or ability to communicate. *Id.* Additionally, Plaintiff's did not have limitation regarding exposure to extreme heat; wetness; humidity; noise; fumes, odors, dusts, gases, or poor ventilation. *Id.* Dr. Fina opined that Plaintiff should avoid concentrated exposure to extreme cold, vibration, and hazards. *Id.*

## II. STANDARD OF REVIEW

The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014). Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007).

Moreover, the court may not focus on an isolated piece of supporting evidence, rather it must consider the entirety of the record weighing both evidence that supports as well as that which detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

## III. ANALYSIS

### A. *The Five-Step Evaluation*

The Commissioner follows a five-step sequential evaluation process to assess whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). This process is defined as follows: Step one asks is the claimant "doing substantial gainful activity[?]" If yes, the claimant is not disabled; step two considers if the claimant has a "severe medically determinable physical or mental impairment[.]" If not, the claimant is not disabled; step three determines whether the claimant's impairments or combination thereof meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App.1. If not, the claimant is not disabled; step four considers the claimant's residual functional capacity and past relevant work. If claimant can still do past relevant work, then he or she is not disabled; step five assesses the claimant's residual functional capacity, age, education, and work experience. If it is determined that the claimant can make an adjust6ment to other work, then he or she is not disabled. 20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the instant case, the ALJ found that Plaintiff engaged in substantial gainful activity during the fourth quarter of 2015 but determined that there had been a continuous 12-month period during which he did not engage in substantial gainful activity. AR at 20. At step two of the sequential evaluation, the ALJ found that "[t]he claimant has the following severe impairments: cervical spondylosis with myelopathy; lumbar spinal stenosis; and degenerative changes in the bilateral knees (20 CFR 416.920(c))." *Id.* The ALJ further found that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926)." *Id.*

at 21. Prior to step four and "[a]fter careful consideration of the entire record," the ALJ determined that "the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) with certain exceptions[,] [including] . . . standing and/or walking must be limited to two hours in an eight-hour workday[,] . . . the climbing of ramps and stairs must be limited to occasionally and the climbing of ladders, ropes or scaffolds must be entirely precluded from work duties as assigned[,] . . . occasionally balancing and stooping (bending at the waist) must also be limited to occasionally while kneeling, crouching (bending at the knees) and crawling must be precluded entirely from the work duties as assigned[,] . . . reaching overhead with the bilateral upper extremities must also be precluded entirely from work duties and handling (gross manipulation) with the bilateral upper extremities must be limited to frequently[,] [and] [w]ithin the assigned work area, there must be less than occasional (seldom to rare) exposure to concentrated extreme cold, vibrations, and hazards, such as unprotected heights." *Id.* at 22. At step four, the ALJ found that "[t]he claimant is unable to perform any past relevant work (20 CFR 416.965)." AR at 27. At step five, the ALJ found that after "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a))." *Id.* at 28. Accordingly, the ALJ determined that Plaintiff was not disabled. *Id.*

Plaintiff asserts that the ALJ erred in failing to give the appropriate weight to the examining source opinion of Dr. Hassman regarding his reaching limitations. *See* Opening Br. (Doc. 18). Plaintiff further asserts that the ALJ impermissibly relied on non-examining state agency consultants with regard to his reaching limitations. *See id.*

### B. *Examining Physician*

Plaintiff asserts that "although the ALJ gave 'great weight' to Dr. Hassman's opinion (ostensibly the same weight she gave to the opinions of the non-examining State Agency consultants) [Tr. 25, 27], the ALJ did not articulate a specific and legitimate reason for deviating from Dr. Hassman's opinion with respect to reaching limitations." Pl.'s Br.

at 9.

"As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996) (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)); *see also Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014). "The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987) (citations omitted)). "The ALJ may not reject the opinion of a treating physician, even if it is contradicted by the opinions of other doctors, without providing 'specific and legitimate reasons' supported by substantial evidence in the record." *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (citing *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)); *see also Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007); *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988). Similarly, "[t]he opinion of an examining physician is, in turn, entitled to greater weight that the opinion of a nonexamining physician." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) (citations omitted). "As is the case with the opinion of a treating physician, the Commissioner must provide 'clear and convincing' reasons for rejecting the uncontradicted opinion of an examining physician." *Id.* (citations omitted). Furthermore, "like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Id.* at 830–31 (citations omitted). "[T]he more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." 20 C.F.R. § 404.1527(c)(4). Additionally, "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician *or* a treating physician." *Lester*, 81 F.3d at 831 (citations omitted); *Buck v. Berryhill,* 869 F.3d 1040, 1050 (9th Cir. 2017).

Here, the ALJ reviewed Plaintiff's allegations, his treatment records, the examining

physicians' reports, and the medical consultants' findings. *See* AR at 22–30. The ALJ noted that "there is minimal evidence to support the presence and limiting effect of other impairments, including right leg pain, shoulder pain with limited range of motion, and thumb pain with difficulty grasping and lifting." *Id.* at 24. The ALJ further observed that "As for the . . . shoulder pain and associated limitations identified by Dr. Hassman in June 2015, the earlier objective findings (as discussed above) of the neurologists – Dr. Noland and Dr. Callahan – minimally support the presence of those impairments and do not support any associated limitations." *Id.* (citations omitted). Moreover, "[w]hen the claimant next saw Dr. Wallach in March 2016, he reported that he was doing well and had no complaints . . . and a concurrent objective examination found . . . full range of motion in his extremities." *Id.* at 24–25 (citations omitted). Contrary to Plaintiff's assertion, the ALJ identified the objective findings that led to her determination that Plaintiff was limited in overhead reaching rather than any broader restriction. "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995) (citations omitted). The Court finds that the ALJ properly considered the record as a whole in making her determination and provided specific and legitimate reasons for deviating from Dr. Hassman's opinion with respect to reaching limitations.

### C. *Non-examining Medical Consultants*

Plaintiff asserts that the ALJ relied on the "flawed opinions" of the non-examining state agency consultants. Pl.'s Br. (Doc. 17) at 10. Plaintiff further asserts that "the ALJ gave 'great' weight to the opinions of the non-examining State Agency physicians, adopting their opinions as the residual functional capacity." *Id.*

The ALJ explained that she "considered the findings of fact made by state agency medical consultants" and determined that their findings were consistent with the evidence as a whole and "their assessment of the claimant's capacity to perform fine manipulation is consistent with the medical treatment evidence, the neurological examinations conducted in late 2014, and the consultative physical examination conducted in June 2015." AR at

| | |
|---|---|
| 1 | 27. There is no evidence to suggest that the ALJ relied on or even considered Dr. Fina's |
| 2 | opinions regarding Plaintiff's knowledge of the social security system. *Id.* In rejecting Dr. |
| 3 | Hassman's functional capacity, the ALJ observed that "while [Dr. Hassman's] assessment |
| 4 | of the claimant's functional capacity is generally consistent with the evidence, I give |
| 5 | greater weight to the evidence as a whole and significant benefit of the doubt to the |
| 6 | claimant, and find that he is more limited than Dr. Hassman determined." *Id.* at 26. In |
| 7 | adopting the opinions of Dr. Combs and Dr. Fina, the ALJ observed that "[a]lthough the |
| 8 | subsequent examination conducted by Dr. Shaw documents significant limitations in the |
| 9 | claimant's right hand, thumb and fingers, there is no evidence in prior to [sic] treatment |
| 10 | records to support those limitations and no evidence to support a worsening in his condition |
| 11 | after he was last seen by his primary care provider in April 2016." *Id.* at 27 (citations |
| 12 | omitted). This Court "will affirm the ALJ's determination of [Plaintiff's] RFC if the ALJ |
| 13 | applied the proper legal standard and [her] decision is supported by substantial evidence." |
| 14 | *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005). In making her RFC |
| 15 | determination, the ALJ properly weighed and considered Plaintiff's subjective complaints |
| 16 | and the medical records and opinions in the record. Substantial evidence supports the |
| 17 | ALJ's decision. |

## IV. CONCLUSION

Based upon the foregoing, the Court affirms the ALJ's decision. Accordingly, IT IS HEREBY ORDERED that:

1) Plaintiff's Opening Brief (Doc. 17) is DENIED;

2) The Commissioner's decision is AFFIRMED; and

3) The Clerk of the Court shall enter judgment and close its file in this case.

Dated this 25th day of March, 2020.

*[signature]*
Honorable Bruce G. Macdonald
United States Magistrate Judge